

**FILED**

Jul 14 2016, 8:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Victoria L. Bailey
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| State of Indiana, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> John K. Sturman, <br> *Appellee-Defendant.* | July 14, 2016 <br><br> Court of Appeals Case No. <br> 49A02-1601-CR-8 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Lisa Borges, Judge <br><br> Trial Court Cause No. <br> 49G04-1508-FC-27608 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant/Cross-Appellee-Plaintiff, the State of Indiana (State), appeals the trial court's dismissal of certain criminal charges filed against Appellee/Cross-Appellant-Defendant, John K. Sturman (Sturman). On cross-appeal, Sturman appeals the trial court's denial of his motion to dismiss additional criminal charges against him.

We affirm in part, reverse in part, and remand.

## ISSUES

The State raises one issue on appeal, which we restate as the following two issues:

(1) Whether the trial court abused its discretion by dismissing three Counts of reckless homicide for failing to state an offense; and

(2) Whether the trial court abused its discretion by dismissing one Count of reckless homicide as being barred by the statute of limitations.

Sturman raises two issues on cross-appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by denying his motion to dismiss three Counts of reckless homicide and fifteen Counts of issuing an invalid prescription on the basis that the Information failed to allege the crimes with sufficient certainty; and

(2) Whether the trial court abused its discretion by denying Sturman's motion to dismiss sixteen Counts of issuing an invalid prescription on the basis that a provision of the Indiana Legend Drug Act is unconstitutionally vague.

## FACTS AND PROCEDURAL HISTORY

Sturman is a physician and has been licensed to practice medicine in Indiana since 2008. He is board certified in neurology, with a subspecialty in pain management. In 2008, Sturman was hired at a pain management clinic that is operated by Indiana University Hospital in Indianapolis, Indiana. In July of 2012, Sturman left his employment at the pain management clinic after Indiana University Hospital suspended his medical privileges for, according to Sturman, "fail[ing] to complete medical charting/documentation of patient visits, a gross deviation from the recognized standard of care." (Appellant's App. p. 31).

In 2012, the Indiana Office of the Attorney General (OAG) commenced an investigation of Sturman after three separate complaints were filed against him with the Licensing Enforcement Section. Those complaints—two filed by former patients and one by an addictions counselor—alleged concerns that, between 2008 and 2012, Sturman had "prescribed a large amount of narcotics to pain management patients." (Appellant's App. p. 29). As part of its investigation, the OAG examined all of the controlled substance prescriptions that were prescribed by Sturman and filled in Indiana between 2009 and 2012. The list of patients for whom Sturman had prescribed controlled substances was provided to the Indiana State Department of Health's Vital Statistics Department, which provided the OAG with death information for any individuals on that list. The list revealed that several of Sturman's pain management patients had "died from drug intoxication, overdose, or related causes of death and had filled a prescription from . . . Sturman within [thirty]

days immediately prior to death." (Appellant's App. p. 31). Of Sturman's now-deceased patients, three are relevant to this appeal: D.E.H., M.K.C., and T.A.V.

[7] Between April 23, 2010 and July 29, 2010, Sturman issued ten prescriptions for controlled substances to D.E.H., including: four prescriptions for Methadone (Schedule II opioid); four prescriptions for Hydromorphone (*i.e.*, Dilaudid) (Schedule II opioid); and two prescriptions for Diazepam (*i.e.*, Valium) (Schedule IV benzodiazepine). On August 6, 2010, D.E.H. died. His autopsy indicated that the cause of death was "Pharmacologic Intoxication." (Appellant's App. p. 33). Dr. Timothy King (Dr. King), "a physician with a medical specialty in [a]nesthesiology and a [s]ubspecialty in [p]ain [m]edicine," reviewed D.E.H.'s medical records and concluded that Sturman had prescribed controlled substances to D.E.H. "without regard for patient safety, without a legitimate medical purpose, and outside the usual course of medical practice." (Appellant's App. pp. 32, 35). Additionally, Dr. Michele Glinn (Dr. Glinn), a consultant in forensic toxicology, reviewed the summary of D.E.H.'s prescribed medications, the autopsy, and the toxicology findings. Dr. Glinn opined that D.E.H.'s "death could be considered the result of toxicity from prescribed medications" and that D.E.H. "was prescribed doses of methadone that were very high compared with a usual adult daily dose." (Appellant's App. p. 36).

[8] Between July 25, 2011 and December 15, 2011, Sturman issued seventeen prescriptions for controlled substances to M.K.C., including: eight prescriptions for Hydromorphone (*i.e.*, Dilaudid) (Schedule II opioid); three

prescriptions for Alprazolam (*i.e.*, Xanax) (Schedule IV benzodiazepine); three prescriptions for Morphine (*i.e.*, Oramorph SR) (Schedule II opioid); two prescriptions for Dronabinol (Schedule III controlled substance); and one prescription for Fentanyl (Schedule II opioid). On December 20, 2011, M.K.C. died. Her autopsy revealed that her cause of death was "Polydrug Intoxication." (Appellant's App. p. 37). After reviewing M.K.C.'s records, Dr. King concluded that Sturman had "prescribe[d] controlled substances without a legitimate medical purpose and outside the usual course of medical practice." (Appellant's App. p. 38). Dr. Glinn opined that M.K.C.'s "death could be considered the result of toxicity from prescribed medications. The amount of Hydromorphone in the postmortem toxicology was noted to be toxic." (Appellant's App. p. 36).

[9] Between April 16, 2009 and September 21, 2011, Sturman issued eighty-one prescriptions for controlled substances to T.A.V., including: one prescription for Methadone (Schedule II opioid); one prescription for Hydrocodone (*i.e.*, Vicodon ES) (Schedule III opioid); twenty-four prescriptions for Lyrica (Schedule V controlled substance); twenty-nine prescriptions for Fentanyl (*i.e.*, Duragesic) (Schedule II opioid); and twenty-six prescriptions for Oxycodone (Schedule II opioid). On October 26, 2011, T.A.V. died. Her autopsy indicated that the cause of death was "Fentanyl Toxicity." (Appellant's App. p. 42). Dr. King concluded that Sturman was "medically inappropriate in his use of controlled substances in the care of [T.A.V.]. He prescribe[d] opiates without a

legitimate medical purpose, and outside the usual course of medical practice."

(Appellant's App. p. 44). Dr. Glinn opined that T.A.V.'s

> death could be considered the result of toxicity from prescribed
> medications. The only drugs found in [T.A.V.] at her time of
> death were the drugs prescribed by [Sturman]. . . . [T.A.V.] was
> prescribed doses of oxycodone that were very high compared
> with a usual adult daily dose and the amount of Fentanyl in the
> postmortem toxicology was noted to be toxic.

(Appellant's App. p. 44).

[10]    In addition to the three aforementioned deceased patients, Sturman also prescribed controlled substances to L.D.F., R.G.R., and Z.A.R., which raised concerns during the OAG's investigation. Between January 15, 2009 and August 23, 2010, Sturman issued seventy-seven prescriptions for controlled substances to L.D.F., including: thirty-three prescriptions for Methadone (*i.e.*, Methadose) (Schedule II opioid); twenty-seven prescriptions for Oxycodone (*i.e.*, Percocet) (Schedule II opioid); and seventeen prescriptions for Alprazolam (*i.e.*, Xanax) (Schedule IV benzodiazepine). Dr. King reviewed L.D.F.'s records and concluded that Sturman "prescribe[d] controlled substance medications without a legitimate medical purpose and outside the usual course of medical practice." (Appellant's App. p. 49). Between March 9, 2012 and May 16, 2012, Sturman issued six prescriptions for Oxycodone (Schedule II opioid) to R.G.R. Again, Dr. King concluded that Sturman had "prescribe[d] opiates without establishment of a legitimate medical purpose and outside the usual course of medical practice." (Appellant's App. p. 52). Lastly, between

December 16, 2009 and October of 2011, Sturman issued approximately fifty prescriptions for controlled substances to Z.A.R., including: thirteen prescriptions for Fentanyl (Schedule II opioid); two prescriptions for Hydrocodone (*i.e.*, Norco) (Schedule III opioid); seven prescriptions for Morphine (*i.e.*, Kadian) (Schedule II opioid); fourteen prescriptions for Oxycodone (*i.e.*, OxyContin) (Schedule II opioid); five prescriptions for Diazepam (*i.e.*, Valium) (Schedule IV benzodiazepine); four prescriptions for Methadone (Schedule II opioid); and five prescriptions for Hydromorphone (*i.e.*, Dilaudid, Exalgo) (Schedule II opioid). Dr. King concluded that "Sturman did not issue controlled substances for a legitimate medical purpose. . . . Medications were issued outside the usual course of medical practice and without medical foundation." (Appellant's App. p. 54).

[11] On August 5, 2015, the State filed an Information,[1] charging Sturman with Counts 1-3, reckless homicide of, respectively, D.E.H., M.K.C., and T.A.V., Class C felonies, Ind. Code § 35-42-1-5 (2011); and Counts 4-19, issuing an invalid prescription for legend drugs by a practitioner, Class D felonies, I.C. §§ 16-42-19-20(b); -27(a).[2] On September 23, 2015, Sturman filed a verified

---

[1] We note that the charging Information uses roman numerals to identify the Counts; however, for the sake of clarity, we will use standard numbers.

[2] Counts 4-7 charge Sturman with issuing an invalid prescription to M.K.C. for, respectively, Dilaudid, Xanax, Morphine, and Fentanyl. Counts 8-9 charge Sturman with issuing an invalid prescription to T.A.V. for, respectively, Fentanyl and Oxycodone. Counts 10-12 charge Sturman with issuing an invalid prescription to L.D.F. for, respectively, Methadone, Oxycodone, and Xanax. Count 13 charges Sturman with issuing an invalid prescription to R.G.R. for Oxycodone. Counts 14-19 charge Sturman with issuing an invalid prescription to Z.A.R. for, respectively, Fentanyl, Morphine, Oxycodone, Dilaudid, Valium, and

motion to dismiss all nineteen Counts for a variety of reasons. In particular, Sturman sought dismissal of Counts 1-6 and 8-19 based on a failure to "state the offenses with sufficient certainty so as to avoid a non-unanimous jury verdict or a double jeopardy violation." (Appellant's App. p. 102). He further requested dismissal of Counts 1 through 3 "because neither the facts stated in the Information nor the probable cause affidavit nor the two read together state offenses as to those [C]ounts." (Appellant's App. p. 102). In addition, Sturman claimed that Counts 1, 3, 8-12, 14-16, 18, and 19 should be dismissed "because conduct alleged to underlie those charges occurred outside the five-year statute of limitations set out in [Indiana] Code [section] 35-41-4-2." (Appellant's App. p. 102). Finally, Sturman argued for the dismissal of Counts 4-19 "because [Indiana] Code [section] 16-42-19-20 [of the Indiana Legend Drug Act] is unconstitutionally vague because the phrase 'legitimate medical purpose' fails to put an ordinary person on notice as to what conduct is prohibited as well as encouraging arbitrary enforcement of the statute." (Appellant's App. p. 103).

[12] On November 12, 2015, the trial court conducted a hearing on Sturman's motion to dismiss. On December 11, 2015, the trial court issued its Findings of Fact and Conclusions of Law. The trial court dismissed Counts 1 and 11 as being barred by the statute of limitations. The trial court also dismissed Counts 8-10, 12, 14-16, 18, and 19 because these charges identified a range of dates

Methadone. Although each charge alleges that only one invalid prescription was issued, the State alleges a different and wide range of dates in which each prescription was purportedly issued.

during which an invalid prescription was allegedly issued, some of which were beyond the statute of limitations. However, the trial court allowed twenty days for the State to amend these charges to allege a singular offense within the statute of limitations. Finally, the trial court dismissed Counts 1-3 for failing to state an offense. Also, the trial court found that Indiana Code section 16-42-19-20 is not unconstitutionally vague and accordingly denied Sturman's motion to dismiss Counts 4 through 19 on that basis. Following the trial court's ruling, the only remaining charges were Counts 4-7, 13, and 17—all of which alleged that Sturman issued invalid prescriptions.

[13] The State now appeals, and Sturman cross-appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Appeal*

[14] The State claims that the trial court erroneously dismissed Counts 1-3—*i.e.*, the reckless homicide charges relating to D.E.H., M.K.C., and T.A.V. We review a trial court's grant of a motion to dismiss a criminal charge under the abuse of discretion standard. *State v. Lindsay*, 862 N.E.2d 314, 317 (Ind. Ct. App. 2007), *trans. denied*. We will reverse the trial court's decision as being an abuse of discretion if it "is clearly against the logic and effect of the facts and circumstances." *Id.* To the extent that our decision requires a statutory interpretation, our review is *de novo* because it presents a question of law. *Sloan v. State*, 947 N.E.2d 917, 920 (Ind. 2011).

[15]    In general, "when a defendant files a motion to dismiss an information, the facts alleged in the information are to be taken as true." *Delagrange v. State*, 951 N.E.2d 593, 594 (Ind. Ct. App. 2011), *trans. denied*. A motion to dismiss is not a proper vehicle for raising "[q]uestions of fact to be decided at trial or facts constituting a defense." *Id.* at 594-95. "A hearing on a motion to dismiss is not a trial of the defendant on the offense charged." *Id.* at 595.

### A.  *Dismissal of Counts 1-3:  Failure to State Offense*

[16]    The State contends that the trial court erred in dismissing the three reckless homicide charges on the basis that they fail to state an offense. Indiana Code section 35-4-1-4(a)(5) provides that "[t]he court may, upon motion of the defendant, dismiss the . . . information" because "[t]he facts stated do not constitute an offense." We will find that dismissal for failure to state an offense is warranted "only when an information is facially deficient in stating an alleged crime." *Pavlovich v. State*, 6 N.E.3d 969, 974 (Ind. Ct. App. 2014), *trans. denied*.

[17]    The purpose of a "charging information is to provide a defendant with notice of the crime of which he is charged so that he is able to prepare a defense." *Lebo v. State*, 977 N.E.2d 1031, 1038 (Ind. Ct. App. 2012). In order "to be sufficient, a charging information generally needs only contain a statement of the 'essential facts constituting the offense charged,' as well as the statutory citation, the time and place of the commission of the offense, the identity of the victim (if any), and the weapon used (if any)." *Pavlovich*, 6 N.E.3d at 975. *See* I.C. § 35-34-1-2(d) (requiring the information to contain "a plain, concise, and definite written

statement of the essential facts constituting the offense charged"). Thus, the State has no obligation "to include detailed factual allegations in a charging information." *Pavlovich*, 6 N.E.3d at 975 (noting that "the State was not required to precisely spell out in the information how [the defendant] was alleged to have solicited [the minor child]"). "[A]dditional materials such as the probable cause affidavit supporting the charging instrument may be taken into account in assessing whether a defendant has been apprised of the charges against him." *Lebo*, 977 N.E.2d at 1035.

[18] The crime of reckless homicide, a Class C felony, requires that "[a] person . . . recklessly kills another human being." I.C. § 35-42-1-5 (2011). "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c). In this case, the Information alleged as follows:

> COUNT [1]
> Between May 10, 2010 and August 6, 2010, [Sturman] did recklessly kill another human being, to wit: D.E.H., by writing and/or issuing prescriptions to D.E.H. for Methadone, Dilaudid, and/or Valium without medical legitimate purpose and outside the usual course of practice;
>
> COUNT [2]
> Between July 25, 2011 and December 20, 2011, [Sturman] did recklessly kill another human being, to wit: M.K.C., by writing and/or issuing prescriptions to M.K.C. for Dilaudid, and/or Xanax and/or Fentanyl without legitimate medical purpose and outside the usual course of practice;

COUNT [3]
Between July 1, 2009 and October 26, 2011, [Sturman] did recklessly kill another human being, to wit: T.A.V., by writing and/or issuing prescriptions to T.A.V. for Fentanyl and/or Oxycodone without legitimate medical purpose and outside the usual course of practice[.]

(Appellant's App. p. 24). The charging Information tracks the language of the reckless homicide statute by alleging that Sturman recklessly killed D.E.H., M.K.C., and T.A.V. Nevertheless, the trial court concluded that Counts 1-3 required dismissal because the State failed to sufficiently allege causation. Specifically, Counts 1-3 "allege the criminal act as writing and/or issuing prescriptions," and this act "alone cannot cause death. The prescriptions must be filled and the medicine ingested in some fashion for there to be any possibility of death." (Appellant's App. p. 262).

[19] In reaching its conclusion, the trial court relied on *Burrage v. United States*, 134 S.Ct. 881 (2014). In *Burrage*, the defendant received a twenty-year mandatory minimum sentence after he sold one gram of heroin to a user who subsequently died from a drug overdose. *Id.* at 885. During the trial, medical experts testified that "multiple drugs were present in [the decedent's] system at the time of his death." *Id.* The toxicologist further testified that the heroin "was a contributing factor" in the decedent's death because "it interacted with the other drugs to cause 'respiratory and/or central nervous system depression.'" *Id.* Because the defendant's minimum twenty-year sentence was a "'death results' enhancement," the fact that death resulted from the use of that drug was

"an element that must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 887. The Supreme Court held that where "the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision . . . unless such use is a but-for cause of the death or injury." *Id.* at 892. Because there was "no evidence that [the decedent] would have lived but for his heroin use," the Supreme Court reversed the defendant's conviction. *Id.* (internal quotation marks omitted). Based on the *Burrage* holding, the trial court in the present case found that the State "bears the burden of showing that the drugs prescribed to the decedents by [Sturman] were the but-for cause of the decedents' deaths." (Appellant's App. p. 262).

[20] The State now argues that in order to sustain its burden of establishing the causation element it "only needs to prove that the defendant's conduct 'was *a* proximate cause' of the death; it does not need to prove that it was 'the sole cause of a death' in order to support a conviction for reckless homicide." (Appellant's Br. p. 19) (quoting *Barber v. State*, 863 N.E.2d 1199, 1205 (Ind. Ct. App. 2007), *trans. denied*). According to the State, "[b]ut for [Sturman's] conduct in providing [the decedents] with prescriptions, they would not have obtained possession of those fatal drugs." (Appellant's Br. p. 20).

[21] Unlike the trial court, we find that, at this point in the proceedings, the State had no burden to prove that Sturman's conduct caused the deaths of D.E.H., M.K.C., and T.A.V. because that is a factual matter to be determined at trial. *See Delagrange*, 951 N.E.2d at 594-95. This case is distinct from *Burrage*

because, there, the Supreme Court considered whether there was sufficient evidence that the defendant's conduct was the but-for cause of the decedent's death *after* the defendant was convicted. Before trial, a motion to dismiss may not be based upon whether there is sufficient evidence to uphold a conviction. *State v. Houser*, 622 N.E.2d 987, 988 (Ind. Ct. App. 1993), *trans. denied.* As such, we reject Sturman's argument that the State failed to allege that he "was the only source of drugs the decedents took" because this goes to the State's burden of proof at trial. (Appellee's Br. p. 15). The issue before our court is simply "whether the charging information adequately alleges that a crime has been committed." *Delagrange*, 951 N.E.2d at 595. We therefore consider both the charging Information and the probable cause affidavit to determine whether the alleged facts constitute an offense.

[22] As to Count 1, according to the Information, Sturman recklessly killed D.E.H. by issuing prescriptions "for Methadone, Dilaudid, and/or Valium without medical legitimate purpose and outside the usual course of practice." (Appellant's App. p. 24). The probable cause affidavit more specifically states that Sturman issued four prescriptions for Methadone, four prescriptions for Dilaudid, and two prescriptions for Valium to D.E.H. during a three-month period. Approximately one week after issuing the last set of Methadone, Dilaudid, and Valium prescriptions, D.E.H. died of "Pharmacologic Intoxication." (Appellant's App. p. 33). The toxicology report identified Diazepam (*i.e.*, Valium), Methadone, and Hydromorphone (*i.e.*, Dilaudid), among other substances, in D.E.H.'s system at the time of death. Dr. King

reviewed D.E.H.'s medical records and noted, in part, that D.E.H. demonstrated a history of substance abuse and drug-seeking behavior, as well as that Sturman failed to identify a "legitimate medical diagnosis" to warrant "the use of opiates for pain control." (Appellant's App. p. 34). He concluded that Sturman "prescribe[d] controlled substances without regard for patient safety, without a legitimate medical purpose, and outside the usual course of medical practice." (Appellant's App. p. 35). Furthermore, Dr. Glinn found that D.E.H. "was prescribed doses of methadone that were very high compared with a usual adult daily dose," and his "death could be considered the result of toxicity from prescribed medications." (Appellant's App. pp. 35-36).

[23] Regarding Count 2, the Information charges Sturman with reckless homicide as to M.K.C. based on the fact that he issued prescriptions "for Dilaudid, and/or Xanax and/or Fentanyl without legitimate medical purpose and outside the usual course of practice." (Appellant's App. p. 24). According to the probable cause affidavit, Sturman prescribed eight prescriptions for Dilaudid, three prescriptions for Xanax, and one prescription for Fentanyl to M.K.C. in a five-month span. Five days after Sturman wrote the last prescription for Dilaudid, M.K.C. died as a result of "Polydrug Intoxication." (Appellant's App. p. 37). The toxicology report detected Alprazolam (*i.e.,* Xanax), Fentanyl, and Hydromorphone (*i.e.,* Dilaudid) in M.K.C.'s system at the time of death. Upon review of M.K.C.'s medical records, Dr. King found, in part, that Sturman's examination "did not define a legitimate pathology that warranted the use of escalating opiates." (Appellant's App. p. 38). Moreover, Dr. King found that

Sturman ignored M.K.C.'s mental health contraindications as well as her complaints indicating negative opiate side effects. Dr. King concluded that Sturman had "prescribe[d] controlled substances without a legitimate medical purpose and outside the usual course of medical practice." (Appellant's App. p. 38). Dr. Glinn opined that M.K.C. had a "toxic" amount of Hydromorphone in her system, and her "death could be considered the result of toxicity from prescribed medications." (Appellant's App. p. 38).

[24] Finally, as to Count 3, the Information charges Sturman with recklessly killing T.A.V. by issuing prescriptions "for Fentanyl and/or Oxycodone without legitimate medical purpose and outside the usual course of practice." (Appellant's App. p. 24). The probable cause affidavit specifies that Sturman prescribed twenty-nine prescriptions for Fentanyl (*i.e.*, Duragesic) and twenty-six prescriptions for Oxycodone to T.A.V. over the course of two and one-half years. Less than one month after Sturman issued the last prescriptions for Fentanyl and Oxycodone, T.A.V. died due to "Fentanyl Toxicity." (Appellant's App. p. 42). The toxicology report indicated that T.A.V. had Fentanyl in her system at the time of death. According to Dr. King, in part, Sturman prescribed Fentanyl and Oxycodone "at high and dangerous doses for pain complaints that do not merit exclusive opiate treatment," and he "ignore[d] clearly defined opiate risk factors including hospitalizations for excessive medication use, inconsistent urine drug testing results, and medication noncompliance." (Appellant's App. pp. 42-43). Dr. King concluded that Sturman was "medically inappropriate in his use of controlled

substances in the care of [T.A.V.] [as] [h]e prescribe[d] opiates without a legitimate medial purpose, and outside the usual course of practice." (Appellant's App. p. 44). Additionally, Dr. Glinn noted that T.A.V. "was prescribed doses of oxycodone that were very high compared with a usual adult daily dose and the amount of Fentanyl in the postmortem toxicology was noted to be toxic." (Appellant's App. p. 44).

[25] While we agree with the trial court that the act of writing a prescription, by itself, is not a criminal offense, the charging Information in the present case clearly indicates that the alleged crime is that of reckless homicide. Moreover, considering both the Information and the probable cause affidavit, and "taking the facts alleged therein as true," it is apparent that the State has charged Sturman with recklessly killing D.E.H., M.K.C., and T.A.V. based on the fact that the three decedents died after ingesting controlled substances that were prescribed by Sturman without a legitimate medical purpose—*i.e.*, in "deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c); *Houser*, 622 N.E.2d at 988. Therefore, we find that the State has satisfied its obligation to allege sufficient facts to constitute the charged offense of reckless homicide. We conclude that the trial court abused its discretion by dismissing Counts 1-3 based on a failure to state an offense.

### B. *Dismissal of Count 1: Statute of Limitations*[3]

[26] The State also claims that the trial court erred by dismissing Count 1 on the basis that it is barred by the statute of limitations. Pursuant to Indiana Code section 35-34-1-4(a)(8), a "court may, upon motion of the defendant, dismiss the . . . information . . . [if] [t]he prosecution is untimely brought." Here, the State charged Sturman with the reckless homicide of D.E.H. as a Class C felony. For a Class C felony, "a prosecution for an offense is barred unless it is commenced . . . within five (5) years after the commission of the offense." I.C. § 35-41-4-2(a)(1). The Information alleges that Sturman committed Count 1, reckless homicide, "[b]etween May 10, 2010 and August 6, 2010." (Appellant's App. p. 24). The Information was filed on August 5, 2015.

[27] The purpose of a statute of limitations is "to insure against prejudice and injustice to a defendant which is occasioned by a delay in prosecution." *Lindsay*, 862 N.E.2d at 317. Thus, "[t]he limitation period seeks to strike a balance between a defendant's interest in being placed on notice so as to be able to formulate a defense for a crime charged and the State's interest in having sufficient time to investigate and develop a case." *Id.* The State bears the burden of proving that the charged offense was committed within the applicable statute of limitations. *Id.*

---

[3] The State does not appeal the trial court's dismissal of Count 11 on statute of limitations grounds. Nor does the State appeal the dismissal of Counts 8-10, 12, 14-16, 18, and 19 based on the fact that the State may proceed with those charges (*i.e.*, issuing invalid prescriptions) after amendment thereof.

[28] According to the probable cause affidavit, Sturman first issued prescriptions to D.E.H. on April 23, 2010, and he last wrote a prescription for D.E.H. on July 29, 2010. Eight days later, on August 6, 2010, D.E.H. died. The trial court concluded that "[t]he Indiana statute of limitations contemplates that the alleged criminal act triggers the statute of limitations, rather than the alleged result from that alleged act—in this case the death." (Appellant's App. p. 259). Because "[t]he criminal act alleged in Count 1 clearly happened outside the statute of limitations even though the death occurred on August 6, 20[10]," the trial court determined that the filing date of August 5, 2015, was beyond the statute of limitations. (Appellant's App. p. 259). It appears that the trial court considered Sturman's issuance of the prescription to be the criminal act that triggered the statute of limitations. Thus, as the last prescription was issued on July 29, 2010, the State would have been required to file charges no later than July 29, 2015.

[29] In turn, the State asserts that the crime of reckless homicide was completed on the date D.E.H. died—*i.e.,* August 6, 2010. As such, the State maintains that the statute of limitations did not expire until August 6, 2015, one day *after* it filed the Information. In an apparent issue of first impression, the State now contends that, for reckless homicide, the statute of limitations period should be held to commence upon the victim's death rather than upon "the last affirmative action [Sturman] took, namely the last prescription he issued to D.E.H." (Appellant's Br. p. 23). According to the State, "[b]y definition, the elements of reckless homicide are not satisfied and complete until a death has

occurred." (Appellant's Br. p. 23). That is, "[i]f no one dies, a person cannot be charged with reckless homicide no matter how reckless his conduct." (Appellant's Br. p. 23).

[30] In support of its argument, the State looks to other jurisdictions. In particular, in *Illinois v. Mudd*, 507 N.E.2d 869, 871 (Ill. Ct. App. 1987), the defendant engaged in a high-speed chase with police officers, which resulted in the defendant colliding with another vehicle, driven by the victim. The victim lost "cerebral functioning," never regained consciousness, and died more than three years after the accident due to respiratory problems incurred while in a coma. *Id.* Although the defendant pled guilty to charges of reckless driving and fleeing from law enforcement shortly after the accident, upon the victim's death, he was charged with reckless homicide. *Id.* The defendant sought to dismiss the charge on the basis that it was barred by the state's three-year statute of limitations. *Id.* The Illinois court explained that

> [t]he elements constituting the offense of reckless homicide may be summarized as an unintentional killing of a person by the defendant while operating a motor vehicle recklessly in a manner likely to cause death or great bodily harm. Without the existence of any one of . . . these elements, the crime itself has not been committed. There can be no homicide without a death. Unless a death occurs, the State cannot investigate, charge, or prosecute for reckless homicide.

*Id.* at 873 (citation omitted). Accordingly, because statutes of limitations "normally begin to run only 'when the crime is complete' and the crime here was complete only upon the existence of the last element, the death of the

victim," the court held that the statute of limitations for reckless homicide was triggered when the victim died. *Id.* (citation omitted).

[31] Sturman, however, argues that the statute of limitations began running at the time he "committed the acts alleged [in] Count 1"—*i.e.*, writing the prescriptions. (Appellee's Br. p. 22). More specifically, in response to the State's assertion that "[w]hen it comes to homicide offenses, there is no criminal act apart from the result," Sturman contends that "[t]he Indiana General Assembly does not agree with the State's interpretation of what constitutes the elements of a criminal offense when it comes to 'homicide offenses' for purposes of the statute of limitations." (Appellant's Br. p. 24; Appellee's Br. p. 19). He directs our attention to the following provision in Indiana's statute of limitations:

> A prosecution for murder may be commenced:
> (1) at any time; and
> (2) regardless of the amount of time that passes between:
> (A) the date a person allegedly commits the elements of murder; and
> (B) the date the alleged victim of the murder dies.

I.C. § 35-41-4-2(d); (Appellant's Br. pp. 23-24). Based on this subsection dealing with the statute of limitations for murder, the trial court found that "it is clear the Indiana General Assembly did not intend for the death to be an element of the offense of [r]eckless [h]omicide for purposes of the statute of limitations" because this provision would be rendered "meaningless if an offense involving a death was not committed until the death occurred for

purposes of the statute of limitations. (Appellant's App. p. 259).[4] Sturman now posits that if "the General Assembly [had] intended for the statute of limitations to begin running on [r]eckless [h]omicide only once the alleged victim died, it could have indicated that as an exception to [Indiana] Code [section] 35-41-4-2(a)(1)." (Appellee's Br. p. 22).

[32] We find that the State's argument—and the guidance of the Illinois court in *Mudd*—is more persuasive. In order to charge a defendant with reckless homicide, he must have "recklessly kill[ed] another human being." I.C. § 35-42-1-5. To "kill" another requires the defendant "[t]o end life; to cause physical death." BLACK'S LAW DICTIONARY 886 (8th ed. 2004). Therefore, until a death occurred as a result of Sturman issuing prescriptions for controlled substances without a legitimate medical purpose, the crime was not complete, and the State could not charge him with reckless homicide. *See Alderson v. State*, 145 N.E. 572, 573 (Ind. 1924) ("A homicide consists not only of striking the fatal blow which produced the death, but it is not complete until the victim has died."). When D.E.H. died on August 6, 2010, the statute of limitations began to run.

---

[4] The trial court attempted to distinguish *Mudd* from the present case by noting that Illinois' statute of limitations does not state that a prosecution for murder may be commenced at any time regardless of the amount of time that passes between the date a person allegedly commits the elements of murder and the date the alleged victim dies. However, Illinois' statute of limitations does state that a prosecution for murder or manslaughter "may be commenced at any time." *Mudd*, 507 N.E.2d at 871.

[33]    Moreover, we find that the trial court's reliance on Indiana Code section 35-41-4-2(d) is misplaced. That statutory provision simply provides that there is *no* statute of limitations for the crime of murder. Conversely, there is no dispute that reckless homicide, as a Class C felony, is subject to a five-year statute of limitations. *See* I.C. § 35-41-4-2(a)(1). The question before our court is merely *when* that period commences, and in either the case of murder or reckless homicide, the crime is not complete until the victim has died. Contrary to the trial court's finding, our holding that the statute of limitations for reckless homicide commences upon the death of the victim does not render Indiana Code section 35-41-4-2(d) meaningless. Rather, notwithstanding whether a significant amount of time passes between the infliction of an injury and death, Indiana Code section 35-41-4-2(d) permits the State to allege that the death was attributable to that injury and file a murder charge. *See, e.g.*, *Alderson*, 145 N.E. at 574 (reciting the former standard that "[d]eath must have occurred within a year and a day after the wound was inflicted to make the killing either murder or manslaughter"). Accordingly, the State's August 5, 2015 Information was not barred by the statute of limitations, and the trial court abused its discretion by dismissing Count 1 on this basis.

## II. *Cross-Appeal*

### A. *Counts 1-6 and 8-19: Failure to State the Offense with Sufficient Certainty*

[34]    Sturman first claims that Counts 1-6 and 8-19 should have been dismissed because these charges "do not state the alleged offenses with sufficient certainty so as to avoid a non-unanimous jury verdict or a double jeopardy violation."

(Appellee's Br. p. 22).[5] Indiana Code section 35-34-1-4(a)(4) provides that a trial court may, "upon motion of the defendant," dismiss an information because it fails to "state the offense with sufficient certainty." It is long settled that "[a]n accused has a right to require that any crime alleged against him be charged with sufficient certainty to enable him to anticipate the proof which would be adduced against him so he could meet it." *Bickel v. State*, 375 N.E.2d 274, 275 (Ind. Ct. App. 1978). Indiana Code section 35-34-1-2(a)(4) requires the State to set "forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition."

### 1. *Juror Unanimity*

[35] Regarding Counts 1-3—the reckless homicide charges, Sturman notes that, using Count 1 as an example, the State charged him with recklessly killing D.E.H. by writing prescriptions "for Methadone, Dilaudid, and/or Valium without medical legitimate purpose and outside the usual course of practice." (Appellant's App. p. 24). He posits that "some jurors may believe the State proved Sturman recklessly killed D.E.H. by prescribing Methadone while others may believe Sturman recklessly killed D.E.H. by prescribing Dilaudid while still others may believe Sturman recklessly killed D.E.H. by prescribing

---

[5] Count 11 was dismissed based on an expired statute of limitations, and as the State has not challenged that dismissal, we need not address it in this section.

In addition, Sturman points out that the trial court, in its ruling, did not address whether the State sufficiently alleged the offenses in terms of jury unanimity and double jeopardy. As such, we will construe the trial court's silence as a deemed denial of Sturman's motion to dismiss these Counts on this basis.

Valium." (Appellee's Br. p. 28). He asserts that "Counts 2 and 3[] suffer from the same flaw and must, therefore[,] be[] dismissed." (Appellee's Br. p. 28).

[36] Similarly, as to Counts 4-6 and 8-19 for issuing an invalid prescription, Sturman argues that

> the State has alleged time frames in which Sturman supposedly issued the invalid prescription to each patient for each drug set out in each [C]ount. However, looking at the [p]robable [c]ause [a]ffidavit, it becomes clear that for Counts 4-6 and 8-19, Sturman is alleged to have prescribed each alleged drug to each alleged patient on more than one occasion during each alleged time frame.

(Appellee's Br. p. 28). As an example, Sturman points out that, regarding Count 4, the State charged Sturman with issuing an invalid prescription to M.K.C. for Dilaudid between July 25, 2011, and December 15, 2011. Looking to the probable cause affidavit, during that same time period, Sturman prescribed eight prescriptions to M.K.C. for Dilaudid. Thus, Sturman argues that this method of charging "allows for non-unanimous jury verdicts" because "[s]ome jurors may find the Dilaudid prescription issued on [July 25, 2011,] was invalid and all the others were valid, some jurors may find the Dilaudid prescription issued on [September 13, 2011,] was invalid and that all others were valid, etc." (Appellee's Br. p. 29). Sturman contends that Counts 5-6 and 8-19 suffer from the same flaw.

[37] We first note that the trial court dismissed Counts 8-10, 12, 14-16, 18, and 19 because "some, but not all, of the identified prescriptions were written outside

the statute of limitations." (Appellant's App. p. 260). The trial court found that "the State has alleged a singular act of issuance and the jury or finder of fact could pick one prescription issued that is barred by the statute of limitations." (Appellant's App. p. 260). As such, the trial court dismissed the charges and ordered the State to file an amended Information within twenty days "to allege specific prescriptions issued after August 5, 2010." (Appellant's App. p. 264). In so doing, the trial court has remedied the errors now asserted by Sturman because the State must identify the specific prescription alleged to be invalid for each of these Counts. Accordingly, we are left to determine whether the State failed to allege Counts 1-6, 13, and 17 with sufficient certainty to avoid a non-unanimous jury verdict.

[38] "A jury must unanimously agree regarding which crime a defendant committed." *Castillo v. State*, 734 N.E.2d 299, 303 (Ind. Ct. App. 2000) (citing *Richardson v. United States*, 526 U.S. 813 (1999)). Furthermore, each count of an information may only include a single offense. *Baker v. State*, 948 N.E.2d 1169, 1175 (Ind. 2011). Therefore, "a disjunctive instruction, which allows the jury to find a defendant guilty if he commits either of two or more underlying acts, either of which is in itself a separate offense, is fatally ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense." *Id.* Nevertheless, the State is permitted to "allege alternative means or 'theories of culpability' when prosecuting the defendant for a single offense." *Id.* In other words, "the State is permitted to 'present[] the jury with alternative ways to find the defendant guilty as to *one*

*element*.'" *Id.* (alteration in original) (quoting *Cliver v. State*, 666 N.E.2d 59, 67 (Ind. 1996)).

[39] We find that Counts 1-3 charge Sturman with one offense: reckless homicide. Within each charge, the State alleges "alternative means" by which the reckless homicide was committed—*i.e.*, that Sturman recklessly killed D.E.H. by issuing prescriptions "for Methadone, Dilaudid, *and/or* Valium without medical legitimate purpose and outside the usual course of practice." (Appellant's App. p. 24) (emphasis added). Thus, so long as each juror is convinced beyond a reasonable doubt that Sturman is guilty of reckless homicide, the jury need not decide unanimously by which theory he is guilty. *Taylor v. State*, 840 N.E.2d 324, 333-34 (Ind. 2006).

[40] As to the remaining charges, Counts 4-6, 13, and 17 each charge Sturman with issuing one invalid prescription, but the probable cause affidavit contains evidence of multiple instances of issuing invalid prescriptions within the same timeframes as alleged in the Information. We find that each of these instances could be considered a separate crime. In *Baker*, the defendant was charged with two counts of child molesting two of his grandchildren "from October 2000 through August 2003" and one count of molesting an unrelated child "in or about 2002." 948 N.E.2d at 1171. On appeal, Baker claimed that his convictions should be vacated due to lack of juror unanimity because "although he was charged with one count of child molesting with respect to each alleged victim, the jury heard evidence of multiple acts of molestation concerning each alleged victim." *Id.* at 1177. Our supreme court held that

> [t]he State may in its discretion designate a specific act (or acts) on which it relies to prove a particular charge. However, if the State decides not to so designate, then the jurors should be instructed that in order to convict the defendant they must either unanimously agree that the defendant committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged.

*Id.* Accordingly, we find that the State has not failed to allege sufficient facts in the Information over concerns that the jury will not reach a unanimous verdict. As in *Baker*, the State will either have to designate a specific act to prove the particular charge, or the jury should be instructed that they must unanimously agree that Sturman committed the same act(s) or that he committed all of the acts included within the time period charged. The trial court did not abuse its discretion in denying Sturman's motion to dismiss these charges.

## 2. *Double Jeopardy*

Sturman also asserts that the drafting of the Information leaves him vulnerable to a double jeopardy violation. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "[T]wo or more offenses are the same offense in violation of [the Indiana Constitution] if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013). It is a double jeopardy violation if there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of

one offense may also have been used to establish [*all of*] the essential elements of a second challenged offense." *Id.*

[42] According to Sturman, if he is convicted of Counts 1-6 and 8-19, "there will be no way to know which of the specific acts (or prescriptions) or combination of acts (or prescriptions) the jury found him to have committed." (Appellee's Br. p. 30). Thus, Sturman posits that the State could charge him in the future "for exactly the same conduct." (Appellee's Br. p. 30). As previously noted, the State's amendment of Counts 8-10, 12, 14-16, 18, and 19 will remedy this purported error as the State has been ordered to allege the issuance of specific prescriptions in the Information. Therefore, the question remains whether Counts 1-6, 13, and 17 have been alleged with sufficient certainty so as to avoid a double jeopardy issue.

[43] Sturman contends that his case is analogous to *Griffin v. State*, 439 N.E.2d 160 (Ind. 1982). In *Griffin*, the charging information provided that "on the 6th day of December, 1980, [the defendant] knowingly received the property of another person that had been the subject of theft and that this act constituted a felony." *Id.* at 161. The information did not provide any facts "which indicate what property was stolen and from whom, nor where he had received the alleged stolen property or from whom." *Id.* The defendant argued that the information "failed in any way to give him notice of the charges he was facing so that he might properly defend himself and further, did not adequately describe the charge so that he could plead this present conviction should he subsequently be charged with receiving the same property." *Id.* Our supreme court discussed

that it is a denial of due process for a defendant to be uninformed as to the nature of the charges against him. *Id.* at 162. Ultimately, the *Griffin* court reversed the defendant's conviction because he "was tried on a charge which was totally inadequate in informing him about what he should defend against and his conviction [placed] him in jeopardy should he be tried again for these crimes because [the court] cannot determine, from the information, what was the property that [the] defendant received as stolen goods." *Id.*

[44] The State, however, contends that Sturman is "at no risk of a successive prosecution based on [the] same prescriptions" because "[t]he charges specify the identity of the victim, the time period covered by the charge, and the identity of the drug prescribed, and the probable cause affidavit provides further information regarding the dates on which each of the prescriptions underlying the charges was issued and filled." (Appellant's Reply Br. pp. 16-17). We agree with the State and find that these details in the charging documents distinguish the present case from *Griffin*. As noted by the State, any attempt to prosecute Sturman again "for these reckless homicides or acts of issuing the same prescriptions would be clearly and easily barred by [the double jeopardy] actual evidence test because it could only be based on the same evidence of the same prescriptions relied upon by the State in this case." (Appellant's Reply Br. pp. 16-17). Therefore, we find no abuse of discretion in the trial court's denial of Sturman's motion to dismiss these charges because the State has alleged the crimes charged with sufficient certainty so as to avoid double jeopardy.

## B. *Counts 4-19: Unconstitutional Vagueness*

Sturman lastly claims that the trial court erred in denying his motion to dismiss with respect to Counts 4-19 because Indiana Code section 16-42-19-20 of the Indiana Legend Drug Act is unconstitutionally vague. We review a constitutional challenge to a statute *de novo*. *Morgan v. State*, 22 N.E.3d 570, 573 (Ind. 2014). A statute is presumed to be constitutional, and it is the burden of the party challenging the statute's validity to overcome that presumption. *Id.* If a statute is capable of two reasonable interpretations, one of which is constitutional, "we will choose the interpretation that will uphold the constitutionality of the statute." *Id.* at 573-74 (quoting *Sims v. United States Fidelity & Guar. Co.*, 782 N.E.2d 345, 349 (Ind. 2003)). We will "nullify a statute on constitutional ground only where such result is *clearly rational and necessary*.'" *Id.* at 574 (quoting *Sims*, 782 N.E.2d at 349).

A criminal statute may be found unconstitutionally vague "(1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits" or "(2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement." *Id.* at 573 (quoting *Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007)). A criminal notice must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden so that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Id.* at 574 (quoting *Brown*, 868 N.E.2d at 467). It is well established that "criminal statutes do not require absolute precision in order to pass constitutional muster. Rather, a statute

'need only inform the individual of the generally proscribed conduct, [and] need not list with itemized exactitude each item of conduct prohibited." *Id.* at 575 (alteration in original) (quoting *State v. Lombardo*, 738 N.E.2d 653, 656 (Ind. 2000)). "There must be something in the criminal statute in question to indicate where the line is to be drawn between trivial and substantial things, so that erratic arrests and convictions for trivial acts and omissions will not occur." *Baumgartner v. State*, 891 N.E.2d 1131, 1136 (Ind. Ct. App. 2008). A statute will only be found void for vagueness if it is "vague as applied to the precise circumstances of the present case. The defendant is not at liberty to devise hypothetical situations which might demonstrate vagueness." *Id.* (citations omitted).

[47] In this case, the challenged statute provides that "[a] practitioner may not knowingly issue an invalid prescription or drug order for a legend drug." I.C. § 16-42-19-20(b). "A prescription or drug order for a legend drug is not valid unless the prescription or drug order is issued *for a legitimate medical purpose* by a practitioner acting in the usual course of the practitioner's business." I.C. § 16-42-19-20(a) (emphasis added). A violation of this provision is a Class D felony. I.C. § 16-42-19-27(a) (2011). Sturman asserts that "[t]he use of the phrase 'legitimate medical purpose' renders [Indiana] Code [section] 16-42-19-20 unconstitutionally vague as applied to Sturman both because it fails to put a person of ordinary intelligence on notice as to what does and does not constitute a legitimate medical purpose and because it authorizes arbitrary enforcement." (Appellee's Br. p. 32).

[48] Our courts have not yet addressed whether the phrase "legitimate medical purpose"—which is not defined by statute—is unconstitutionally void for vagueness. We have long held that "[p]enal statutes should be interpreted in order to give efficient operation to the expressed intent of the legislature. Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute." *Glover v. State*, 760 N.E.2d 1120, 1123 (Ind. Ct. App. 2002) (citation omitted) (quoting *Becker v. State*, 703 N.E.2d 696, 698 (Ind. Ct. App. 1998)), *trans. denied*. Sturman, relying on the Merriam-Webster Online Dictionary, notes that the word "legitimate" is defined as "conforming to recognized principles or accepted rules and standards." (Appellee's Br. p. 33). The word "medical" means "of, relating to, or concerned with physicians or the practice of medicine." (Appellee's Br. p. 33). Finally, the definition of the term "purpose" is "the aim or intention of something." (Appellee's Br. p. 33). Based on "the plain meaning" of these words, Sturman surmises that "a prescription issued for a 'legitimate medical purpose' is a prescription the aim or intention of which is to conform to recognized principles or accepted rules and standards relating to the practice of medicine." (Appellee's Br. p. 33) (internal quotation marks omitted). This presents a vagueness problem, according to Sturman, because the General Assembly has failed to give

> any indication [(1)] what the recognized principles or accepted rules and standards are[;] or [(2)] who determines when a principle has become recognized or when a rule or standard has become accepted[;] or [(3)] where one should look to determine if

> a principle is recognized or not or whether a rule or standard is accepted or not.

(Appellee's Br. pp. 33-34).[6] We disagree.

[49] The fact that the statute itself does not define what the accepted standards are does not render the provision vague because, as Sturman recognizes, the phrase "legitimate medical purpose" requires physicians to prescribe legend drugs in accordance with the commonly recognized standards of the medical field. In the context of medical malpractice cases, our courts have long relied on the expert testimony of other medical professionals to set forth the applicable standard of care and to offer an opinion as to whether the care that was rendered by a defending physician fell below that standard. *See, e.g., Syfu v. Quinn*, 826 N.E.2d 699, 704 (Ind. Ct. App. 2005). In the present case, Dr. King testified that physicians are held to a standard of care in prescribing controlled substances. Where state and federal laws do not specifically regulate prescribing practices, Dr. King explained that physicians are expected to look to learned treatises published by medical professional organizations "to determine the standards." (Tr. p. 24). Dr. King also indicated that practitioners define the appropriate standards of care based on their experience in practicing medicine over time, which "leads to a spectrum of standards." (Tr. p. 26). Thus,

---

[6] We do not address Sturman's argument that the trial court misinterpreted a federal case in determining that Indiana Code section 16-42-19-20 is not unconstitutionally vague because our review of the statute's constitutionality is *de novo*. *Morgan*, 22 N.E.3d at 573.

physicians have discretion to choose among a wide range of treatment options, but "there are endpoints beyond which it can be considered not to be within the standards." (Tr. p. 27). In all cases though, Dr. King specified that a legitimate medical practice requires physicians to conduct an independent medical examination; establish a diagnosis; formulate a treatment plan; and monitor the patient for effect.

[50] Ultimately, we find that the phrase "for a legitimate medical purpose" is clearly intended to permit doctors, acting within the bounds of the standards of the medical field, to treat patients with diagnosed medical conditions. At the same time, the statute is intended to prevent physicians from acting as common drug dealers by prescribing drugs to individuals with contraindications for controlled substances and without first examining the patient, establishing a diagnosis, formulating a treatment plan, and monitoring the effects of the prescribed medications. Because the statute plainly informs physicians that they must look to the accepted standards of care of the medical profession, we conclude that the statute provides sufficient notice of the prohibited conduct.

[51] However, Sturman also argues that the statute is unconstitutionally vague because it authorizes arbitrary enforcement. Specifically, Sturman contends that "the language employed in [Indiana] Code [section] 16-42-19-20 surrenders too much discretion to other branches of government to decide who has violated them and who has not." (Appellee's Br. p. 37). That is, "the General Assembly has left to police and prosecutors and juries to decide how to define 'legitimate medical purpose' with no meaningful guidance. . . . [W]hether or

not a criminal defendant faces charges under [Indiana] Code [section] 16-42-19-20 will depend on something as arbitrary as . . . a doctor with a particular philosophy and opinion that some other doctor was not acting with a legitimate medical purpose." (Appellee's Br. pp. 37-38). Again, we disagree.

[52] Like Indiana's Legend Drug Act, the federal Controlled Substances Act (CSA) prohibits any person from knowingly or intentionally dispensing a controlled substance. *See* 21 U.S.C. § 841(a)(1) (2010). An exception to the CSA permits authorized medical professionals to prescribed controlled substances "only 'for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'" *United States v. Birbragher*, 603 F.3d 478, 485 (8th Cir. 2010) (quoting 21 C.F.R. § 1306.04(a)); *see* 21 U.S.C. § 829(a),(b) (authorizing a "practitioner" to prescribe controlled substances). The *Birbragher* court found the provisions of the CSA "sufficiently clear that the speculative danger of arbitrary enforcement does not render it void for vagueness." *Birbragher*, 603 F.3d at 489. This is because the statute creates a "narrow exception for distribution [of controlled substances] within the usual scope of professional practice" and "[n]either the government nor the jury is free to impose its own subjective views about what is and is not appropriate; rather, the government is obliged to prove, and the jury constrained to determine, what the medical profession would generally do in the circumstances." *Id.* at 485 (quoting *United States v. Quinones*, 536 F.Supp.2d 267, 274 (E.D. N.Y. 2008)). We agree with this rationale and therefore conclude that Indiana Code section 16-42-19-20 is not unconstitutionally vague because it allows for arbitrary

enforcement. Because this statute is not unconstitutionally vague, the trial court did not abuse its discretion by denying Sturman's motion to dismiss Counts 4-19.

## CONCLUSION

[53] Based on the foregoing, we conclude that the trial court abused its discretion by dismissing Counts 1-3 on the basis that the trial court failed to state an offense in the Information, and by dismissing Count 1 as being barred by the statute of limitations. We further conclude that the trial court did not abuse its discretion by denying Sturman's motion to dismiss Counts 1-6 and 8-19 on the basis that the charges do not state the alleged offenses with sufficient certainty; nor did the trial court abuse its discretion by denying Sturman's motion to dismiss Counts 4-19 on the basis that Indiana Code section 16-42-19-20 is unconstitutionally vague.

[54] Affirmed in part, reversed in part, and remanded.

[55] Kirsch, J. and Pyle, J. concur